The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At all times in question, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. At all times in question, the employer-employee relationship existed between defendant-employer and plaintiff.
3. At all times in question, The Building Center, Inc. was a self-insured employer.
4. (558858) Plaintiff earned an average weekly wage which would generate a compensation rate of $222.00.
5. (558858) On 19 July 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
6. (558858) Plaintiff has been paid compensation at the rate of $219.94 per week since 19 July 1995.
7. (604367) The date of the alleged injury was 8 February 1995.
8. (624820) The date of the alleged injury was 22 February 1995.
9. (646662) The date of the alleged injury was 10 August 1994.
In addition, the parties stipulated into evidence a Form 22 dated 7 August 1995.
The parties submitted a pre-trial agreement dated 24 November 1997 which is incorporated by reference.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff, who is thirty-five years old, began working for defendant in February or March 1994. His job involved transporting windows and doors from the building supply company to construction sites and other customer locations. He worked with another employee and they would be assigned as a team to a truck which they used to make the deliveries.
2. On or about 10 August 1994, plaintiff and Kevin McKay were pushing a door unit weighing hundreds of pounds when plaintiff lost his balance and the door began to tip over. While trying to hold it up until Mr. McKay could get out of the way, plaintiff experienced severe pain in his right shoulder. The falling door also cut his chest. He did not seek medical treatment immediately but on 23 August 1994 went to the emergency room and indicated that the pain in his shoulder had increased over the previous twenty-four hours. He was unable to abduct his right arm at that time. The emergency room physician treated him with medication, a sling and modified work. On 25 August he went to Dr. Loftus, an orthopedic surgeon who had previously treated him for knee problems. Dr. Loftus recommended that he not work and that he continue wearing the sling. Apparently, defendant would not offer him light duty and he decided to return to work after two to four days of rest.
3. Before Dr. Loftus next saw plaintiff in follow-up, plaintiff re-injured his shoulder while helping his sister move some furniture, and he reported to the emergency room on 18 September 1994 with increased symptoms. The emergency room physician's impression was that he had a left shoulder strain probably on top of a rotator cuff tear. Plaintiff returned to the emergency room again on 27 September 1994 requesting more pain medication. He reported that he had strained his shoulder again. Dr. Loftus then examined him on 29 September 1994. At that time, his clinical picture had not changed so it was Dr. Loftus' impression that the intervening injury had not played a significant role in his shoulder pathology. However, defendant denied liability for further treatment so no additional testing was performed. Plaintiff continued to experience problems with his right shoulder and at some point Dr. Loftus recommended that he undergo an MRI for diagnostic purposes. The test had not been performed by the time the doctor's testimony was taken.
4. On or about 10 August 1994, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The fact that the door fell over constituted an unusual occurrence which interrupted his regular work routine.
5. The shoulder symptoms which plaintiff has experienced since the incident in August 1994 are a proximate result of that incident. He requires additional medical evaluation for that condition and has not reached maximum medical improvement.
6. Plaintiff continued working despite his shoulder problems, in part because he took such pride in his physical strength. On 8 February 1995 he was taking siding off of a truck when he lost his balance and fell backwards. He not only twisted his right knee, but the siding also struck him on the knee. Following the incident, he tried to act as though nothing significant had occurred, but his coworker noticed that his knee was quite swollen and took him to the emergency room. By the time he reached the hospital, he could not bend his knee. He was referred to Miller Orthopedic and his knee was aspirated that day.
7. On 8 February 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The fact that he twisted his knee and his knee was struck by siding when he lost his balance that day constituted an unusual occurrence which interrupted his regular work routine.
8. Plaintiff apparently returned to work following his knee injury and on 22 February 1995 sustained another injury at work. He was motioning the truck backwards to a house where he and David Christenberry were making a delivery when he stepped into a gully and lost his balance. He grabbed the porch with his right hand in order to keep from falling. The ramp of the truck then came back against his hand and crushed several fingers against the porch. He was taken to the emergency room where a laceration to his middle finger was stitched. The stitches were subsequently removed on 28 February 1995 and he was allowed to work at regular duty.
9. On 22 February 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The fact that his fingers were crushed between the truck ramp and the porch constituted an unusual occurrence which interrupted his regular work routine. He received no further treatment for the injury after 28 February 1995.
10. Plaintiff then saw Dr. Loftus on 7 March 1995 for the knee injury he had sustained a month earlier. Dr. Loftus was of the impression that he probably had a loose body in his knee due to the injury. Plaintiff had had a number of surgeries to his knee before the accident at work so he also had degenerative changes. Apparently, Dr. Loftus recommended arthroscopic surgery but plaintiff decided to postpone it for a while and continued working.
11. Finally on 19 July 1995, plaintiff sustained a compensable injury by accident when he injured his back while putting down three sheets of plywood. He was treated by Dr. Loftus for that injury, as well. After a period of conservative treatment, Dr. Loftus performed surgery to his back on 16 October 1995 and then followed his recovery.
12. Plaintiff continued to have significant physical problems with his knee, his back and his shoulder. On 10 May 1996 he underwent the knee surgery previously recommended. Dr. Loftus found a loose body and some torn cartilage which were repaired during the operation. However, plaintiff was unable to regain his strength and subsequently developed additional problems with his knee despite the surgery. Dr. Loftus performed another arthroscopic procedure on 8 May 1997 in which he found another loose body, another tear in the lateral cartilage plus further degenerative changes. However, the doctor could not say that these findings likely resulted from the injury at work. It was just as likely that they were the result of the long-standing degenerative process in plaintiff's knee.
13. As a result of the physical limitations from his injuries which were not resolved with medical treatment, the life style changes required by those limitations and the fact that his self-esteem had been so tied to his physical strength, plaintiff became increasingly depressed. By April 1997 he was showing such strong signs of depression that Dr. Loftus referred him to Dr. Patterson, a psychiatrist. The findings of Dr. Patterson were not in the record but he had plaintiff involuntarily committed on 30 April 1997 to Charter Pines Hospital. Dr. Cockerill, the psychiatrist who was medical director of the hospital, evaluated plaintiff on 1 May 1997 and concluded that his identity had developed around his physical prowess and his perceived ability to be physically superior to others, that he had lost that capability due to his injury and that he was suffering from an adjustment disorder with mixed emotional features. Dr. Cockerill also initially thought that he had post traumatic stress disorder, but that diagnosis was not ultimately supported by the facts. In any event, plaintiff did not appear to be imminently dangerous to others or himself, so Dr. Cockerill discharged him from the hospital later that day.
14. Plaintiff was re-admitted to Charter Pines Hospital on 22 July 1997. He indicated at that time that defendant had canceled his follow-up appointment with Dr. Niewiadomski and would not authorize an MRI of his shoulder, that his worker's compensation checks had come in late and that he had been evicted. His girlfriend had found him in the bathroom with a gun in his mouth. Dr. Cockerill oversaw his treatment during the next six weeks. He was initially treated in an inpatient program but on 25 July was transitioned to partial hospitalization.
15. On 3 September 1997 plaintiff called Dr. Cockerill and told the doctor that he intended to take an overdose of medication. Dr. Cockerill then had him transported to a nearby hospital in Cabarrus County where he was transferred to Broughton Hospital for treatment. Medical records from his hospitalization were not placed into evidence so the specifics of his diagnosis and treatment there were not disclosed. However, he was apparently discharged by 10 September 1997 when he was evaluated by Dr. Barr, a psychiatrist at the Mental Health Center in Charlotte. She diagnosed his condition as a chronic adjustment disorder with depressed mood arising from physical problems which had led to a change in his self-image. It was her opinion that he also had long-standing personality issues which made it difficult for him to accept the physical changes he had experienced.
16. As of the date of hearing on 2 December 1997, plaintiff was still being treated at the Mental Health Center, although Dr. Barr recommended that he also undergo further therapy, not only for his psychological problems but also for his apparent addiction to narcotic pain medication.
17. Two days after the hearing, Dr. Loftus performed another operation to plaintiff's right knee and found some loose bodies and a degenerative tear in the cartilage. However, those conditions were not likely to have resulted from plaintiff's injury at work.
18. Defendant accepted liability for plaintiff's back injury, although neither a Form 21 agreement nor a Form 60 admission of liability were submitted to the Industrial Commission. However, compensation for temporary total disability was paid to plaintiff until the date of hearing regarding that claim. Apparently, the medical bills arising from treatment from that injury were also paid. Dr. Loftus indicated that plaintiff reached maximum medical improvement regarding his back condition around 5 June 1997, but the doctor wanted him to undergo a functional capacity evaluation which presumably was never approved by defendant since it had not been performed as recommended.
19. Plaintiff remained unable to work in any capacity due in part to his back and shoulder injuries, through the date of hearing. After June 1997 his disability was largely due to his psychiatric condition which was a direct result of his overall physical impairment from his various injuries plus his degenerative knee condition. Dr. Cockerill for various reasons did not obtain an accurate history and believed that plaintiff had undergone a single very traumatic event which had resulted in all of his physical problems. However, Dr. Cockerill's diagnosis was consistent with that of Dr. Barr. Plaintiff had a pre-existing personality disorder which made it difficult for him to accept and cope with the physical changes he underwent following his injuries. He responded with depression, agitation and impulsivity.
20. Plaintiff's personality problems also appeared to have made his claims more difficult to handle since he would try to "tough it out" for so long that questions would arise as to the cause of the problem for which he was finally asking for medical treatment. The initial knee problems which led to his surgery in May 1996 were a proximate result of his 8 February 1995 accident, but the knee problems he developed subsequently were not related to that injury at work. The shoulder problems which have continued to bother him were, in fact, a proximate result of his 10 August 1994 accident at work.
21. The shoulder and back injuries were significant in terms of plaintiff's overall physical impairment in May 1997. Even though the degenerative knee condition which was unrelated to his injury at work was his primary complaint when he first saw Dr. Cockerill that month, it was not the only factor in his depression. His back symptoms had been sufficiently severe that Dr. Loftus still had not released him to return to work even though it had been a year and one-half since he underwent back surgery. By June 1997 his shoulder became more of an issue, along with defendant's denial of medical treatment for that condition, and his psychiatric problems were further aggravated.
22. The psychiatric problems which caused plaintiff to be unable to work in any capacity after June 1997 were a proximate result of the injuries he sustained to his back and right shoulder.
23. Plaintiff has not reached maximum medical improvement with respect to his psychiatric problems and his right shoulder condition. He requires further medical treatment for both. Specifically, he needs to undergo an MRI to his shoulder so that Dr. Loftus can properly evaluate that condition.
24. The hand injury plaintiff sustained on 22 February 1995 did not play any part in his subsequent disability or psychiatric problems. Dr. Loftus evaluated his hand in December 1995 and gave him a rating to his middle finger. No further treatment was recommended.
25. Plaintiff sustained a five percent permanent partial disability to his right second finger as a result of his 22 February 1995 injury by accident.
26. Plaintiff has reached maximum medical improvement with respect to his knee injury of 8 February 1995. Dr. Loftus initially gave him a fifteen percent permanent partial disability rating but appeared to retract that rating based upon additional information provided by defendant in the deposition, and he did not ultimately give a final rating. Furthermore, the rating he gave was for the knee and not the leg as a whole. Consequently, ruling on this issue is reserved until such time as Dr. Loftus is able to form an opinion regarding the amount of permanent partial disability plaintiff sustained to his leg as a result of the injury.
27. In all four instances, plaintiff gave prompt verbal notice of his injuries to his employer, and his employer had actual knowledge of the injuries and at least the initial medical treatment. In any event, notice was not properly raised as a defense in the pre-trial agreement.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. (646662) On or about 10 August 1994 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The accident resulted in an injury to his right shoulder. G.S. § 97-2 (6).
2. (604367) On 8 February 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The accident resulted in an injury to his right knee. G.S. § 97-2 (6).
3. (604367) Since plaintiff was already receiving compensation for temporary total disability for his back condition when he would have been out of work for his knee surgery, he would not be entitled to compensation for temporary total disability for his knee injury. G.S. § 97-34.
4. (624820) On 22 February 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The accident resulted in an injury to his right hand. G.S. § 97-2 (6).
5. (624820) Plaintiff is entitled to compensation at the rate of $222.00 per week for two weeks for the five percent permanent partial disability he sustained to his right second finger as a result of this injury by accident. G.S. § 97-31 (4) and (19).
6. (558858) On 19 July 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. The accident resulted in an injury to his back. G.S. § 97-2 (6).
7. (558858 and 646662) In that plaintiff's back and shoulder injuries were significant contributing factors in the development of his disabling depression, he is entitled to ongoing compensation for temporary total disability from the date of hearing at the rate of $222.00 per week and continuing for as long as he remains so disabled. G.S. § 97-29.
8. Plaintiff is entitled to have defendants provide all medical compensation arising from all four injuries by accident. Medical compensation shall include the MRI recommended by Dr. Loftus and appropriate psychiatric and psychological care. G.S. §97-2(19); G.S. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. (558856 and 646662) Defendant shall continue to pay compensation to plaintiff for temporary total disability at the rate of $222.00 per week from the date of hearing and continuing for as long as he remains so disabled. If defendant has not already reimbursed plaintiff for the difference in the compensation rate previously paid and the rate agreed to by the parties, defendant shall also pay that additional compensation. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee hereinafter approved.
2. (624820) Defendants shall pay compensation to plaintiff at the rate of $222.00 per week for two weeks for his permanent partial disability. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of his four injuries by accident, including those arising from an MRI to his shoulder and from appropriate psychiatric and psychological care.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. He shall receive a lump sum from the accrued compensation and shall thereafter receive every fourth check. Additionally an attorney's fee of $750.00 is awarded to Plaintiff's counsel for this appearance, which shall be taxed to the defendant as cost pursuant to N.C. Gen. Stat. § 97-88.
5. Defendants shall pay the costs.
This the 3rd day of December 1998.
 S/ ____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ _____________________ DIANNE C. SELLERS COMMISSIONER